Good morning, your honors. My name is David Zugman. I represent appellant Melissa Morton. We have raised three issues on this appeal, and I, of course, want to discuss whatever your honors prefer to discuss, but I'd like to begin with a couple of brief observations. The first is I'm glad I'm in front of a panel that has a lot of trial court experience and has seen cases very similar to this, and Judge Wilson had a tough job dealing with the Mortons. There's no question about that. However, these tax protester cases shouldn't be an excuse to water down the mens rea required for a tax case. There's a great irony here. The government and the defense are arguing the same set of facts. There is no disagreement about what happened. The only disagreement is about whether the Mortons held a good faith belief that what they were doing was allowed by law. That's the only disagreement. In that respect, it is no different than any number of fraud trials that we run into. I mean, sometimes in fraud trials, people attempt to deny what they did, but the Mortons didn't do that. Indeed, they embraced it. Mr. Morton, at every turn, would say, explain his theories, which were wide ranging, about why he was not liable to pay taxes. Now, turning to the issues themselves, this case is like a reductionist ad absurdum. We begin with the affidavit. Why oh why would the affidavit be left in a locked car when we're going to search the Mortons? That was creating an unnecessary issue. It would have been easy enough to bring the affidavit to the search, knowing that the Mortons were likely to litigate anything and everything, especially with respect to what Mr. Morton considered to be his constitutional rights. Now, given my introduction and given what I've said, the defense has essentially embraced all the facts, and the lion's share of the government's evidence was documents that were provided to the IRS. There would be no basis to move to suppress, as the Mortons themselves provided this evidence to the IRS. Counsel, I think we understand you're going to argue that the affidavit did not accompany the warrant, and that's problematic, but there were two exhibits that were attached to the warrant. Is that correct? I believe so, Your Honor. Were they a part of the warrant from the inception? So, I'm not exactly sure what Your Honor means by inception. Well, when the warrant was issued, were those exhibits A and B, attachments A and B, actually attached to the warrant? Physically attached to the warrant. I don't know the answer to that question. As I understand the issue, it is the affidavit itself as coordinating the agent's discretion in searching, and whether the search team itself was properly apprised, and whether... Do you know whether the attachments were present at the search? The affidavit that is the subject of... I know your argument regarding the affidavit. I'm talking about the attachments. I concede that I do not know that, Your Honor. But given that, what I said about the documents from the Mortons to the IRS forming the bulk of the evidence, that naturally transitions to the other two issues, and there's actually a little synchrony between these two issues. Ms. Morton's claim that there should have been a mistrial granted when Mr. Morton was allowed to have his freestyle narrative statement at trial was that Ms. Morton, he talked about her experience in banking, and Ms. Morton's defense on the jury instructions is that the jury instructions downgraded the mens rea. Now ordinarily, when we have fraud cases, the government begins, middle, and end with overwhelming evidence, overwhelming evidence, overwhelming evidence. But in this particular case, there cannot be overwhelming evidence, because it is about whether Ms. Morton actually had a good faith belief. Now good is used there in genuinely held belief, rather than being morally righteous belief. And I think there's a lot of evidence to indicate that Ms. Morton did have these beliefs when it came to Mr. Morton. Mr. Morton deserves his own special focus, given his conduct and what he's done to get himself in prison for 72 months. The guy apparently is quite the storyteller. I looked at what he said at trial, and I saw a little bit about what he said outside of trial. He says things that involve Area 51, and aliens, and mythical beasts, and he says these things so fast, and in such quick succession that once he's said them, and the person does not dispute them, they all of a sudden become like they're acknowledged facts, that these are just things that happened, that he really did expose Area 51, and that his mother was a serious contender for the vice presidency, which apparently she was. And Ms. Morton, who fell in love with Mr. Morton, and Ms. Morton, several years before this terrible calamity in her life came to full bloom, she appears to be the sort of credulous person that was taken in by Mr. Morton's particular brand of flim-flam. And she wanted to argue that she genuinely believed all this stuff. And I just don't understand what the government is so afraid of in these tax protester cases. I cannot imagine a jury of 12 people who all pay their taxes, being okay with the idea that these people have a personally vested, a personal belief that the tax law doesn't apply to them, and doesn't apply to anyone, and never should have, and that this thing is just unfair. In my experience, when jurors find out that their time away from their jobs and their family is being spent so that someone like Mr. Morton can explain to them why no one ever, ever has to pay taxes, and to the contrary, they are due millions of dollars, I think that's a pretty quick conviction. In fact, the government was able to achieve a conviction in, what was it, 90 minutes in this case? So I think that there's a danger in saying, okay, well, because this is a tax protester case, we have to really guard against this whole, we really believe this stuff, because that actually isn't a good defense in almost any kind of trial. I had a client who was an arson client who claimed to rub kerosene on his skin when he was caught, smelling like kerosene, as a way to preserve his skin. And the jury convicted him pretty quickly, too. I think that the government should take these people at their word, let them put on their crazy theory that no one is required to pay taxes, because in 1933, there was a secret cabal of bankers that took over the United States. Well, one of your issues has to do with the comment that Mr. Morton made in his monologue or whatever it was when he was talking to the jury, his testimony, I guess, and he referred to her as having banking experience. Why is that a problem? Well, for a couple of reasons. The first one is, I think Judge Wilson, it's a tough call about whether to let someone, he invited Mr. Morton to speak in a narrative, and Mr. Morton took full advantage of that. When he said that Mrs. Morton had extensive experience or experience in banking, Mrs. Morton's entire defense was, I believe this guy and I had no reason to disbelieve him. He was talking about stuff that I had no idea. What if the prosecutor had asked that question? Did your wife have experience in banking? What would the objection have been? So the question being, it wasn't there and it was that admissible evidence independently. What would the objection have been if that had been a question? I would say, I would have objected under 403, of course, but whether... How does the prejudice outweigh the relevance? You just told us that the defense was that they were naive. The defense was that they believed this theory. I don't know that, it seems like those two things are two shifts passing in the night. The tax protester, I don't believe that the laws is currently written and being interpreted by courts. The courts are just getting them wrong and I have the correct solution and it involves me getting millions of dollars that somehow I did not earn. Ms. Morton's banking experience would show that she's a serious, buttoned down person who knows that there are rules to such things. With regard to this particular error that you're arguing, it's more like a can't unring the bell type of argument, correct, because the district court did strike the comment. Was there a curative instruction given to the jury to disregard the comment? I think in the same general curative instructions that questions that are stricken are not considered to be evidence. The judge definitely hit it right when it happened and it was stricken and it is an unring the bell kind of situation specifically because the nature of the defense. The defense here, there's no factual disagreements that I can spy except in sort of how the investigation itself proceeded but with respect to the underlying conduct, the Mortons have embraced, they still embrace that this was legal, that this was consistent with the law. In that kind of situation where the only contest is Ms. Morton's good faith belief, that's a serious problem when Mr. Morton says, well, she was also a banker and it wasn't, I hesitate to say because Mr. Morton put the court in such a difficult situation but it seems a little bit of an unforced error. There was no need to give, Mr. Morton hadn't asked for his time to give his narrative description. Unless the court has anything further, I'll turn it over to you. Good morning, Your Honors. May it please the court, Assistant United States Attorney James Hughes on behalf of the United States. Your Honors, in September of 2015 when the government was investigating the Mortons, prior to the execution of the search warrant in this case, they were confronted with a situation where they had discovered evidence that the Mortons were engaged in sort of a cottage industry of fraud. They had found evidence that they were engaged in the preparation of false financial instruments on behalf of other individuals, frivolous UCC filings, as well as evidence through trash runs showing that the Mortons may have also been involved in filing frivolous litigation claims on behalf of their clients. The government had also found evidence that all of this was sort of being run through a nominee corporation called Heaven and Earth LLC and that the Mortons had actually been using it as sort of a crockpot where they were putting in their legitimate income as well and running it out of a PO box. Confronted with that situation, the IRS drafted an affidavit which was based on the circumstances on the ground that they were confronted with, which is that there is not a clear picture of just how the records regarding this enterprise are being maintained. But that information regarding the investigation they had conducted to date, that was outlined in an 87-page affidavit of Special Agent Luce Hawk and the attachment of the items to be seized, which was included with the search warrant, listed out 22 distinct categories of items that the IRS was. Was it attached at the issuance of the warrant? Yes, Your Honor. The actual list of items to be seized was included with the warrant. The 87-page affidavit, that was a separate document, although the warrant referenced it in the first page of the warrant through the words of incorporation. That affidavit, it was provided to the agents who executed the search on two separate occasions on a pre-operation briefing the day before, as well as a pre-operation briefing that took place directly before the search. And the searching agent, who was the sort of head agent of this search, Peter Lue, he did let the other agents know that the warrant was available, or the affidavit was available, if they chose to need to review it during the search. And defense counsel for Ms. Morton has taken great pains to point out that it was in a locked car. However, that locked car was across the street. The agent who was the head of the search was the individual with the keys. He had informed all the agents executing the search, if they need to review the affidavit, it is available. So is it your position that that's sufficient to meet the requirement that the affidavit accompany the warrant? Yes, Your Honor. How about if it had been two blocks away? When would you, what would the distance be where you would concede that it did not accompany the warrant? I mean, certainly, if it's going to be a situation where the distance would preclude or seriously inconvenience the agents to the point where they might think that we're not going to do it, then that's a different situation. But where it literally is across the street and where an agent has let the agents know this is available, it's sort of a glorifying of the room where it's searched. I mean, it's available. They've read it on two separate occasions and they know it's there for them to use, should they so need it. And additionally, Your Honor, it's important to note that of these 22 categories of items that Ms. Moran's counsel has identified, there's really only one that they've pointed out and it is at the end of that list and it's essentially the category that allows for the seizure of correspondence. As the record shows, the search warrant evidence that was produced at trial was produced by calling two agents, Luke Yu and John Kersling. Luke Yu was a seizing agent. John Kersling was a computer forensics agent. And essentially, the evidence that was introduced, it was composed of two categories. One was a series of client files that had been found in a plastic tub inside the defendant's residence and where the client files were actually grouped together. These were the bonds, the UCC filings, certified mailing receipts. And the computer files were essentially the same thing, only kept in PDF form. It's essentially this evidence that was seized and was actually used at trial, it would have fallen into any number of the permissible categories in this warrant. If we decide that the attachment, which you said accompanied the warrant, satisfies the particular requirement, do we need to reach the question of whether the affidavit properly accompanied the warrant? Well, if the court decides that the attachment, the list of items to be seized, which was attached to the search warrant, if that satisfies particularity and the over-breath analysis, then no, I don't think your honors need to actually decide whether or not the affidavit was incorporated. But if the attachment standing alone does not satisfy those requirements, I think you would need to reach whether or not this affidavit was incorporated. Well, as to over-breath, doesn't the exclusionary rule apply and we'd have to do that analysis? Yes, your honor. I believe that under over-breath you would still need to look to the affidavit, I'm sorry, I misspoke, to determine whether or not probable cause is shown for each of the categories. So yes, you are correct. But I don't believe that necessarily for that to determine whether or not it was incorporated for purposes of particularity. But that's what I'm asking and perhaps I'm being confusing. As to particularity, if attachment B meets the particularity requirement, then why would there be a need to also analyze the incorporation of the affidavit issue? I don't think there is, your honor. You are correct. Yes, let me follow up question to that. Category U, which is the category that opposing counsel has highlighted, that's the correspondence category. And there is a provision that says any correspondence or correspondence with any third party. And I mean, I think standing alone that could present some problems. Was there anything introduced at trial starting there that would qualify as correspondence with any third party that would not otherwise fall within the scope of the warrant? There was correspondence that was introduced. And I will clarify by saying that there was correspondence introduced over the course of the trial. But I will limit my analysis to correspondence seized during the search warrant. Sure. There was correspondence seized during the search warrant that was introduced at trial. The correspondence that was seized was, I believe, exclusively correspondence that was kept inside these files where they'd maintained their bond client files. It would be covered by another category? It would have been covered by another category. I believe there was also correspondence between Mr. Morton and the California Franchise Tax Board regarding his personal bonds that he had submitted to the California Franchise Tax Board. However, that correspondence was, again, kept inside a file that he had maintained of his bond, the UCC filings, and the certified mailing receipts. And you would say, for example, that would be covered by category P? I believe the category is... Category P is about financial instruments, UCC files, or tax returns. Yes. And I believe it would also be covered under K, which had requested the information used in the preparation of those financial instruments. Thank you. With regard to the remaining issues that were raised by Ms. Morton's counsel, I believe the case law, such as Bishop and Tuohy, although it does use the term willfulness when describing what is necessary in a 371 conspiracy, those same cases, they also describe willfulness as a standard that is analogous to what exactly is listed in the Ninth Circuit's model jury instructions for a 371 conspiracy to defraud, which is an intent to reach an agreement and an intent to defraud, an intent to essentially hinder a legitimate legal government function through deceit. The government does not believe that either Bishop or Tuohy require that the court prove cheek willfulness in order to obtain a conviction for a 371 conspiracy to defraud. With regard to the jury instructions, am I correct in understanding that there was a joint set of instructions submitted? Yes, Your Honor. Were there any disputed jury instructions? Did the district court have a conference on disputed instructions at all? Yes, Your Honor. There was a conference on disputed jury instructions that related primarily to a potential jewel instruction. But not any of the instructions are now being disputed on appeal? Well, the 2B instruction, which was the instruction that was provided for accounts 33 through 24 through 56, but for Mrs. Morton it was only 33 through 56. That instruction was essentially created by the court, and so it was not the subject of the joint jury instructions that were submitted by the parties in this case. As we laid out in our brief, the court's creation of that instruction, it was the product of the fact that our initial 514 instruction, which the parties had agreed to, that instruction listed the wrong counts at its header. While trial was ongoing, as the jury instructions were being given, the government realized that the wrong counts had been listed in that instruction and then alerted the court to that. Unfortunately, the instruction was then changed so that it only applied to counts 6, 7, and 8 rather than the remaining counts of 514. And so a correct instruction was provided listing out the elements of a false financial instrument charge for count 8 for Mrs. Morton, which is the count that precedes all the subsequent 514 charges that were related to bonds prepared for other individuals. However, the 2B instruction that was provided for those subsequent counts of 514, that's counts 33 through 56 of the indictment, that instruction did, as it was sort of this constantly changed thing, it did end up omitting the instruction regarding the requisite intent for those 514 counts. However, as we laid out in our brief, essentially these were extremely analogous facts. You have financial instruments that were virtually identical to the financial instrument submitted by Mrs. Morton to the IRS on her own behalf, and the jury did find that she had submitted that financial instrument with the intent to defraud. To determine that she lacked that intent with regard to subsequent instruments, it would have essentially needed to find that she had developed a good faith and belief in the legitimacy of the program after she knew it was fraudulent when submitting these bonds on her own behalf to the IRS. And there's just, to the government's mind, no reasonable probability that that had. There's no reasonable doubt that she had that intent to defraud when she submitted the financial instrument to the IRS, which the jury found. And so that intent, I mean, would have carried over to the subsequent instruments prepared on behalf of third parties. Were there any other questions? And with regard to, and I'll just very quickly address the 287 and the mistrial motion. For the mistrial motion, this was given in the midst of sort of a rambling screed by Mr. Morton. He had claimed during this speech that he had interviewed Janet Yellen, that the government was bankrupt, and that really it was just in the mix of a mishmash of testimony which really did not  a curative instruction was very quickly given. And I would point out that, to the government's mind, really that statement was, there's no reason why it shouldn't have been admissible anyway. And it was just one of several pieces of evidence that was provided regarding her intent. With regard to the 287 claim and defense's claim that 287 requires cheap willfulness, this circuit and several unpublished opinions and other circuits have found that cheap willfulness is not required for a 287 charge. All that is required is that the claim is made against the United States and that the defendant knows the claim is false. With that, Your Honor, if there are no further questions, I would submit. All right. Thank you. Unless Your Honor has any particular questions, I would also submit. Thank you very much to both sides for your argument in this case. The matter is submitted.
judges: Nguyen, Owens, Antoonii